**Che KELLY, by Her Next Friend, Vera KELLY and Vera Kelly, Plaintiffs–Appellants,**

v.

**Darwin JACKSON, M.D., Jonathan R. Reed, OB–GYN Services, Inc., A Professional Corporation, Defendants–Respondents.**

No. 72653.

Supreme Court of Missouri, En Banc.

Nov. 20, 1990.

Rehearing Denied Dec. 18, 1990.

Douglas P. Dowd, St. Louis, for plaintiffs-appellants.

Anthony R. Behr, Marlene E. Ernst, Clayton, M. Jane Schweitzer, William L. Davis, Robyn Fox, St. Louis, for defendants-respondents.

COVINGTON, Judge.

Che Kelly, by her next friend, and her mother, Vera Kelly, brought a medical malpractice action against Darwin Jackson, M.D., and Jonathan R. Reed, OB/GYN Services, Inc., for injuries sustained by Che

Kelly during her birth. The court entered a verdict for defendants. The court of appeals reversed and remanded, finding that the trial court committed reversible error when it denied plaintiffs' counsel the opportunity to argue an adverse inference from defendants' failure to call a witness. This Court granted transfer. The judgment of the trial court is affirmed.

Vera Kelly was first referred to Dr. Jonathan Reed in December of 1983. He examined her and fixed her expected delivery date at June 23, 1984. Vera Kelly made several prenatal visits to Dr. Reed's office. Dr. Reed usually attended to Vera Kelly, but on two occasions his associate, Dr. Jackson, saw her instead.

Che Kelly was born on June 24, 1984. She was delivered by Dr. Jackson, who was "on call" that day. During delivery Che Kelly encountered shoulder dystocia, a condition in which the child's shoulder is caught behind the mother's symphysis pubis bone. When shoulder dystocia occurs there is a risk of the umbilical cord prolapsing, and brain damage will result if the child is not delivered quickly. During Che's delivery, lateral flexion caused a severed brachial plexus resulting in a permanent condition of Klumpke–Erb's palsy, or partial paralysis of Che's right arm.

In their first point plaintiffs contend that the trial court erred in refusing to permit plaintiffs to argue an adverse inference from defendants' decision not to call Dr. Reed to testify. Plaintiffs contend that as the president and sole owner of the corporation of which Dr. Jackson was an employee at the time of the delivery, Dr. Reed was not an "equally available" witness.

■ Failure of a party to call a witness who has knowledge of facts and circumstances vital to the case generally raises a presumption that the testimony would be unfavorable to the party failing to offer the testimony. *Leehy v. Supreme Exp. & Transfer Co.*, 646 S.W.2d 786, 790 (Mo. banc 1983). To allow reference in closing argument to a party's failure to produce a witness is reversible error if the witness is equally available to both parties. *Id.* Similarly, it is prejudicial error for the trial court not to sustain an objection to an improper argument. *Id.*

The rule's origin predates modern rules of discovery. *Chavaries v. Nat'l Life & Accident Ins. Co. of Tennessee*, 110 S.W.2d 790, 794 (Mo.App.1937). The eastern district of the court of appeals recently observed that with the advent of modern discovery, application of the rule has become more difficult. *Routh v. St. John's Mercy Medical Center*, 785 S.W.2d 744, 747 (Mo. App.1990). Earlier cases enunciated inflexible rules. One rule held an employee necessarily more available to his employer merely because of that status. *Duboise v. Railway Express Agency*, 409 S.W.2d 108, 114 (Mo.1966). Another held that a party's treating and examining physician is necessarily more available to that party. *Richardson v. Wendel*, 401 S.W.2d 455, 460 (Mo.1966). In 1978, in *Midwest Library Serv. v. Structural Syss.*, 566 S.W.2d 249, 252 (Mo.App.1978), the court held that deposing the witness made the witness "equally available" to both parties thereby destroying the inference and its arguability.

■ The rules relating to adverse inference arguments were modified in 1979 when this Court set forth in *Hill v. Boles*, 583 S.W.2d 141 (Mo. banc 1979), a balancing test on the question of "equal availability." The question depends on several factors, three of which include: (1) one party's superior means of knowledge of the existence and identity of the witness; (2) the nature of the testimony that the witness would be expected to give in the light of his previous statements or declarations, if any, about the facts of the case; and (3) the relationship borne by the witness to a particular party as the same would reasonably be expected to affect his personal interest in the outcome of the litigation and make it natural that he would be expected to testify in favor of the one party against the other. *Hill v. Boles*, 583 S.W.2d at 145–46.

In 1983, recognizing the appropriateness of a closer examination of the "equal availability" cases upon their own individual facts and circumstances, this Court specifi-

cally rejected the "extreme holdings" of earlier cases, noting the "impracticability of inflexible rules." *Leehy v. Supreme Exp. & Transfer Co.*, 646 S.W.2d at 790, n. 4. Application of the *Hill v. Boles* factors should operate either "to solidify or dispel" any presumption of availability arising from special relationships of a party and a witness, depending upon circumstances shown in evidence in a particular case. *Id.*

■ Application of the *Hill v. Boles* factors does not occur in a vacuum. The general rule relating to availability assumes that the witness has knowledge of facts and circumstances "vital to the case." In the present case, the issue is negligence during delivery of the child, and the facts and circumstances vital to the case are those that bear on the question of negligence of Dr. Jackson during delivery. Dr. Reed was not present during labor and delivery. Any relevant evidence that he might offer, therefore, would necessarily be limited to testimony given in his capacity as an expert witness, in his capacity as employer of Dr. Jackson at the time of the delivery, or, perhaps, in his capacity as treating physician of Vera Kelly.

The first *Hill v. Boles* factor is not at issue in this case. As in *Leehy*, the second and third factors are related. It might be expected that Dr. Reed would testify in favor of defendants. He was endorsed by defendants as an expert on liability, causation, and damages. He was president and sole owner of the defendant corporation of which Dr. Jackson was an employee at the time of the delivery. A judgment against the defendant-corporation could conceivably carry unfavorable consequences for Dr. Reed. Plaintiffs' allegations of unequal availability in major part rest upon these observations.

Under the law as it has developed, however, plaintiffs cannot simply assume a finding of unequal availability upon their mere allegations. This is so particularly in light of the fact that plaintiffs extensively deposed Dr. Reed and made use of his deposition testimony at trial. While deposing a witness does not ultimately make the witness equally available, *Leehy*, 646

S.W.2d at 790, n. 4, the circumstances shown in evidence in this case as they relate both to the substance of the plaintiffs' deposition of Dr. Reed and to the plaintiffs' use of Dr. Reed's deposition at trial serve to "dispel any presumption of availability arising from the special relationship" of defendants to Dr. Reed under application of the second and third *Hill v. Boles* factors.

Of the seventy-six pages of the deposition taken of Dr. Reed by the plaintiffs, the actual testimony of Dr. Reed constitutes approximately fifty-six pages. Plaintiffs generally treat Dr. Reed as an expert. Plaintiffs direct their questions to the appropriateness of the procedures used by Dr. Jackson during delivery. The deposition confirms that Dr. Reed was not present during delivery and had no personal or direct knowledge of the labor and delivery. Dr. Reed's testimony throughout is that he had no criticism of any of Dr. Jackson's actions based upon Dr. Reed's review of delivery records and Dr. Jackson's deposition.

■ During the second day of trial, plaintiffs' attorney proceeded to read portions of Dr. Reed's deposition to the jury. Commencing with the earliest pages of the deposition, plaintiffs' counsel read selectively through page fifty-nine, highlighting portions of Dr. Reed's testimony regarding the forceps delivery that plaintiffs hoped might cast doubt on the standard of care rendered by Dr. Jackson. It has been said, and it is appropriate to repeat under the circumstances of this case, that a party may not have the advantage of an adverse inference while benefiting by reading favorable portions of the witness' deposition to the jury. *Bostwick v. Freeman*, 349 Mo. 1, 160 S.W.2d 713, 718 (1942). Plaintiffs sought to benefit from the deposition they had taken of Dr. Reed.

Plaintiffs do not suggest in what manner Dr. Reed was available to defendants but not available to plaintiffs, nor do they intimate what testimony of Dr. Reed might have harmed defendants—what "vital facts and circumstances" related to the question of negligence were not available to plain-

tiffs under these circumstances. Plaintiffs not only deposed Dr. Reed as defendants' expert but also took opportunity in deposition to inquire into any conversation Dr. Reed may have had with Dr. Jackson. Dr. Reed responded that he discussed the delivery with Dr. Jackson, that Dr. Jackson described what occurred at delivery and the maneuvers and techniques he used to deliver the infant. Upon inquiry by plaintiffs, Dr. Reed stated that he took no issue with the medical procedures employed by Dr. Jackson. Plaintiffs inquired no further. Nothing in the deposition indicates that Dr. Reed was evasive or uncooperative in discussing the procedures used by his former employee. Under these circumstances there is nothing to suggest Dr. Reed's knowledge of the vital facts and circumstances relevant to delivery was not equally available to plaintiffs.

 Plaintiffs suggest that the mere fact that defendants identified Dr. Reed as an expert and advised the jury that he would testify, then ultimately chose not to call Dr. Reed, gives rise to a presumption of unequal availability. There is no such presumption. Furthermore, under the circumstances of the evidence in this case, plaintiffs' suggestion is without support. Defendants called two expert witnesses, one the chief of obstetrics and gynecology at Barnes Hospital in St. Louis and the other the director of maternal/fetal medicine at Washington University's medical school. Each gave extensive testimony at trial. The adverse inference rule does not apply where the evidence would simply be corroborative or cumulative, *Russell v. St. Louis Public Serv.*, 251 S.W.2d 595, 599 (Mo.1952), as would have been Dr. Reed's testimony as an expert. Furthermore, plaintiffs had already read substantial portions of Dr. Reed's testimony into the record.

Finally, plaintiffs assert that the reference by counsel for Dr. Jackson to a "community of interest" in closing argument is a basis sufficient to permit plaintiffs to argue a negative inference. Cases cited by plaintiffs in support are inapposite, and plaintiffs fail to acknowledge counsel's words in their context:

> He [Dr. Jackson] and Dr. Reed were employer and employee back then in 1984. Dr. Reed's testimony you heard Dr.—Mr. Dowd read it—from his deposition extensively. I didn't put Dr. Reed back on to go over it again but they have a *community of interests*. You can't find against the corporation unless you find that Dr. Jackson was negligent and I—my gosh I hope you do not believe that Dr. Jackson was negligent in the way he handled this emergency. I honestly just don't see that as an appropriate finding. I urge you to go upstairs and take these verdict forms and when you have read the instructions and talked about the case as much as you want to *find in favor of Dr. Reed and his corporation—he's not a defendant in this case—and Dr. Jackson.* (emphasis added)

The language speaks for itself. Use of the words "community of interests" is not sufficient to establish the prerequisites of an adverse inference argument that Dr. Reed had knowledge of the vital issues of the case and was not available to plaintiffs when his previous deposition testimony indicates otherwise.

The record in this case demonstrates that the trial court did not err in refusing to allow plaintiffs to argue an adverse inference from defendants' counsel's decision not to call Dr. Reed to testify in their case.

Plaintiffs next contend that the trial court prejudicially erred in sustaining defendants' objection to the following "admissions" made by Dr. Reed as related by Ms. Kelly:

> Ms. Kelly: Well, he said these—no, he said—he said there was no way of knowing that I guess my pelvic bones was [sic] too small. I don't know. I didn't know what he meant by that, and he kind of mumbled like made a mistake or something. He said it real low that we made a mistake, it was something to that effect.

Plaintiffs sought to offer Dr. Reed's statement—"we made a mistake"—as an admission against interest.

■■ A trial court has considerable discretion in the exclusion of evidence and, absent abuse of discretion, its action will not be grounds for reversal. *Karashin v. Haggard Hauling & Rigging, Inc.*, 653 S.W.2d 203, 205 (Mo. banc 1983). Verbal admissions against interest are regarded as the weakest and most unsatisfactory kind of evidence and should be received with caution and subjected to careful scrutiny because they are subject to error, imperfection and mistake. *O'Neil v. Claypool*, 341 S.W.2d 129, 134 (Mo.1960).

■■ Ms. Kelly's testimony is vague, equivocal, and without specificity. The absence of its probative value is immediately apparent. Further explication of that fact is not required. The trial court did not abuse its discretion in sustaining defendant's objection to the admission of this evidence.

■■ Plaintiffs claim that the trial court erred in overruling their objection to the following comment by Dr. Jackson's counsel in closing argument: "But think for a minute of Dr. Jackson. Sitting there all week and being vilified as a negligent physician who is incompetent to deliver a baby." The particular word at issue is "incompetent." Plaintiffs argue that incompetence was not in issue, thus counsel's statement in closing argument improperly introduced an issue foreign to the issues submitted.

It is improper for counsel in argument to go beyond the issues and urge prejudicial matters. *McCandless v. Manzella*, 369 S.W.2d 188, 191 (Mo.1963). Arguing a matter outside the submitted issues, however, does not constitute a per se ground for the granting of a new trial. "In ruling on the propriety of final argument, the challenged comment must be interpreted in light of the entire record rather than in isolation." *Titsworth v. Powell*, 776 S.W.2d 416, 422 (Mo.App.1989). The trial court is possessed of broad discretion in the area of closing arguments. *Lewis v. Bucyrus–Erie*, 622 S.W.2d 920, 925 (Mo. banc 1981).

Courts accord counsel wide latitude in arguing the facts and in drawing inferences from the evidence, and the law indulges a liberal attitude toward argument, particularly where the comment complained of is fair retort or responds to prior argument of opposing counsel. *Id.* at 926.

Examined in the light of the entire record, counsel's argument did not introduce a foreign issue into evidence. Plaintiffs charged Dr. Jackson with negligence. In his closing argument, counsel responded to the charge. Earlier in his argument counsel had stated: "If you believe he [Dr. Jackson] was negligent. That is the Key. That's what this whole case has been about. Was he or was he not negligent, and that's what the court requires that you find before you can bring in a verdict for the plaintiffs." In the context of the entire record, the word "incompetent" was intended and would have been understood by the jury as a synonym for "negligent."

Plaintiffs rely on *Calvin v. Jewish Hospital of St. Louis*, 746 S.W.2d 602 (Mo.App. 1988). *Calvin* held that when an attorney excludes a witness' testimony on his own motion, and then requests the jury to draw an adverse inference from his opponent's failure to produce that witness, the attorney's conduct constitutes manifest injustice. *Calvin* has no application here. Defendants did not argue the issue of incompetence nor ask the jury to draw any adverse inference.

Counsel's argument did not submit a foreign issue to the jury, nor did his argument serve unduly to prejudice or inflame the jury. The trial court did not abuse its discretion.

Plaintiffs raise a number of unpreserved issues. During cross-examination of Dr. Jackson, his counsel objected to plaintiffs' cross as being "unfair." Plaintiffs submit that this spoken objection, combined with counsel's charge in closing argument that plaintiffs' counsel had "vilified" Dr. Jackson, resulted in a verdict tainted by passion and prejudice. This Court considers the question under *Rule 84.13(c)* under which the Court also considers plaintiffs' request

in subsequent points relied on for plain error review of several other statements by counsel during closing argument. *Rule 84.13(c)* authorizes review of error affecting substantial rights when the court finds that manifest injustice or miscarriage of justice has resulted. After consideration of each allegation of error and review of the entire record, this Court finds no manifest injustice or miscarriage of justice.

The judgment of the trial court is affirmed.

BLACKMAR, C.J., ROBERTSON, HIGGINS and HOLSTEIN, JJ., and MORGAN, Senior Judge, concur.

RENDLEN, J., concurs in result.

BILLINGS, J., not sitting.