STATE of Missouri, DEPARTMENT OF SOCIAL SERVICES, DIVISION OF AGING, Appellant,

v.

CARROLL CARE CENTERS, INC., Respondent.

No. WD 56714.

Missouri Court of Appeals, Western District.

Jan. 18, 2000.

As Modified on Denial of Rehearing Feb. 29, 2000.

Steven M. Mitchell, Jefferson City, for appellant.

Harvey M. Tettlebaum, Jefferson City, for respondent.

Before Presiding Judge HAROLD L. LOWENSTEIN, Senior Judge FOREST W. HANNA [1] and Judge LAURA DENVIR STITH.

LAURA DENVIR STITH, Judge.

Plaintiff–Appellant, the State of Missouri, Department of Social Services, Division of Aging ("the State"), appeals the trial court's dismissal of its suit against Defendant–Respondent, Carroll Care Centers, Inc. ("Carroll"). The State argues that the trial court erred in dismissing its claim that Carroll violated Section 198.067.3 of the Omnibus Nursing Home Act because its Petition properly set out allegations of violations by Carroll of Class I standards of the Act.[2] The trial court disagreed, implicitly agreeing with Carroll that a violation of that section of the Act occurs only if the nursing home has failed to correct a cited deficiency at the time of reinspection, and here it is conceded that the deficiency was corrected at the time of reinspection. We also agree with Carroll's interpretation of the Act and affirm this aspect of the trial court's decision.

The State also asserts that the trial court erred in dismissing Count II in which it alleged that Carroll violated Section 198.067.10, in that the cited deficiencies resulted in serious physical injury to a resident of Carroll's nursing home. The State argues that because Carroll failed to include in its motion to dismiss any separate argument as to why the State did not make a claim under that subsection, and because a motion to dismiss can be granted only for reasons stated in the motion, it was error to dismiss its allegation under Section 198.067.10. We agree. Unlike Section 198.067.3, Section 198.067.10 does not require proof that the alleged deficiency still existed at the time of reinspection, and, thus, whether the State made a case under it depends on different issues than whether the State made a case under Sec-

---

1. Judge Hanna took senior status between the date this case was submitted and the date of this opinion.

2. All statutory references are to RSMo Cum. Supp.1996, unless otherwise indicated.

tion 198.067.3. For this reason, the trial court erred in dismissing the State's claims under Section 198.9067.10 at the time it dismissed the State's claim under Section 198.067.3, and we reverse and remand that portion of the trial court's order for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This suit involves the question whether Carroll violated the Omnibus Nursing Home Act, codified in Chapter 198 of the Missouri statutes ("the Act"), in regard to its care of John Doe, a patient admitted as a resident at Blue Ridge Nursing Home in 1997. Blue Ridge is operated by Carroll. Nursing homes such as Blue Ridge must meet certain standards in order to be licensed, and if they violate these standards they are subject to fines and penalties, the number and severity of which depends on the seriousness of the violation and the time it takes to correct the violation.

Section 198.085 sets out three levels of standards which nursing homes must meet:

(1) Class I standards are standards the violation of which would present either an imminent danger to the health, safety or welfare of any resident or a substantial probability that death or serious physical harm would result;

(2) Class II standards are standards which have a direct or immediate relationship to the health, safety or welfare of any resident, but which do not create imminent danger;

(3) Class III standards are standards which have an indirect or a potential impact on the health, safety or welfare of any resident.

Sec. 198.085.

In September 1997, the State inspected Blue Ridge Nursing Home. One of the patients in the nursing home at that time was John Doe. At the time of his admission, John Doe had a known medical history including exposure to tuberculosis, but he showed no active symptoms of the disease. On September 15, 1997, the inspector allegedly discovered that Carroll allowed John Doe to remain in the general patient population at the nursing home, despite the fact that he began showing symptoms of a severe respiratory condition which was later diagnosed as tuberculosis. The inspector believed that this constituted a violation of Class I standards of the Act, and issued Carroll a written statement of deficiencies, pursuant to Section 198.026.1, which, in summary, notified it that it violated the standards of the Act by: (1) admitting and continuing to care for residents whose needs cannot be met by the facility directly or in cooperation with outside resources; (2) failing to provide each resident with 24 hour protective oversight and supervision; (3) failing to provide each resident with personal attention and nursing care in accordance with his/her condition and consistent with current accepted nursing practice; and (4) failing to use acceptable infection control procedures and to make arrangements for prompt transfer for residents having or suspected of having a communicable disease, and failing to make a report to the Division of Social Services within 7 days when a resident is diagnosed as having a communicable disease.[3]

---

3. Section 198.026.1 provides:

Whenever a duly authorized representative of the department finds upon an inspection of a facility that it is not in compliance with the provisions of sections 198.003 to 198.096 and the standards established thereunder, the operator or administrator shall be informed of the deficiencies in an exit interview conducted with the operator or administrator or his designee. The department shall inform the operator or administrator, in writing, of any violation of a class I standard at the time the determination is made. A written report shall be prepared of any deficiency for which there has not been prompt remedial action, and a copy of such report and a written correction order shall be sent to the operator or

It also issued a notice of noncompliance for violation of a Class I standard and, pursuant to Section 198.029, provided copies of the notice to social service agencies and hospitals and provided for it to be posted at the center, and warned Carroll Care that it must adopt a plan of correction in accordance with Section 198.026.2.

Section 198.026.2 provides that a nursing home shall have five working days following receipt of a written report and correction order concerning a Class I violation to submit a plan of correction, and the State has five days thereafter to approve or disapprove the plan. A plan for a Class I standard violation requires immediate action, and the State must reinspect the facility within 20 days to determine whether the plan has been successfully implemented. Longer periods of time are allowed for correction and reinspection if Class II or III standards are violated. *Id.*

Section 198.026.3 provides that if, at the time of reinspection, the nursing home is not in substantial compliance with the Act's standards or if the operator is not correcting deficiencies in accordance with the plan of correction, then the State shall issue a notice of noncompliance. Section 198.026.4 provides:

> The notice of noncompliance shall inform the operator or administrator that the department may seek the imposition of any of the sanctions and remedies provided for in section 198.067, or any other action authorized by law.

Sec. 198.026.4 RSMo 1994.

Here, when the State conducted its follow up investigation on October 15, 1997, the State determined that Carroll's violations had been adequately addressed and corrected, so no notice of noncompliance was issued pursuant to Section 198.026.4. Nonetheless, on July 13, 1998, the State filed a civil penalty action against Carroll under Section 198.067. It alleged that, by leaving John Doe in the general patient population while he was experiencing severe respiratory symptoms, Carroll had violated Class I standards for the operation of nursing homes and was subject to penalty for that violation, even though the violation had been corrected by the time of reinspection. Citing Section 198.067.3,[4] the State sought $575 per day per violation for the 30 days following the initial determination of violation on September 15, 1997, until the time of reinspection on October 15, 1997. This totals $2,300 per day, or $69,000. The State also sought $3,800 as an additional monetary penalty under Section 198.067.10, alleging that the violations had caused serious physical injury to John Doe.[5] In total, the State requested $72,800 in fines under both sections.

On September 2, 1998, Carroll filed a motion to dismiss the action, asserting that the State failed to plead an essential element of its claim for recovery in that the State failed to allege facts showing that Carroll's action constituted an actionable "violation" as that term is defined in Section 198.067.3, since the State did not allege that Carroll failed to correct the deficiencies by the time of reinspection. Section 198.067.3 states:

> 3. The operator of any facility which has been cited with a violation of sections 198.003 to 198.096 or the regulations established pursuant thereto, or of subsection (b), (c), or (d) of section 1396r of Title 42 of the United States Code or the regulations established pursuant

administrator ... within ten working days after the inspection, stating separately each deficiency and the specific statute or regulation violated.
Sec. 198.026.1 RSMo 1994.

4. Section 198.067.3 provides for the assessment of a civil monetary penalty of not less than $150, nor more than $1000, per day for

each day that each such violation occurs, up to a maximum civil monetary penalty of $10,-000.

5. Section 198.067.10 permits an additional civil penalty of $100 multiplied by the number of licensed beds in the facility up to a total aggregate additional penalty of $10,000.

thereto, is liable to the state for civil penalties of up to ten thousand dollars for each day that the violations existed or continues to exist. Violations shall be presumed to continue to exist from the time they are found until the time the division of aging finds them to have been corrected. The amount of the penalty shall be determined as follows:

(1) For each violation of a class I standard, not less than one hundred fifty dollars nor more than one thousand dollars;

(2) For each violation of a class II standard, not less than fifty dollars nor more than five hundred dollars;

(3) For each violation of a class III standard, not less than fifteen dollars nor more than one hundred fifty dollars;

(4) For each violation of a federal standard which does not also constitute a violation of a state law or regulation, not less than two hundred fifty dollars nor more than five hundred dollars;

(5) For each specific class I violation by the same operator which has been cited within the past twenty-four months and for each specific class II or III violation by the same operator which has been cited within the past twelve months, double the amount last imposed. *As used in this subdivision the term "violation" shall mean a breach of a specific state or federal standard or statute which remains uncorrected and not in accord with the accepted plan of correction at the time of the reinspection* conducted pursuant to subsection 3 of section 198.026 or the regulations established pursuant to Title 42 of the United States Code. A judgment rendered against the operator of a facility pursuant to this subsection shall bear interest as provided in subsection 1 of section 408.040, RSMo.

Sec. 198.067.3 (emphasis added).

The State effectively admitted that Carroll was correct that no violation of Section 198.067.3 occurred if, as Carroll asserted, a violation is determined by the definition of violation just quoted, for it is uncontested that Carroll corrected the cited deficiencies by the time of reinspection. The State claimed, however, that the just-quoted definition of "violation" set out in Section 198.067.3 does not apply to violations under subsection 198.067.3(1), but rather applies only to repeat violations under subsection 198.067.3(5). In support, the State noted that the definition of violation immediately follows subsection 198.067.3(5), and that it uses the phrase "as used in this subdivision the term 'violation' shall mean . . . ." The State suggested that Section 198.067 itself should be labeled as a "section," and subpart 198.067.3 as a "subsection" of that section. Therefore, the State argues, paragraphs 198.067.3(1)-(5) must be "subdivisions" of subsection .3 of Section 198.067. And, the State argues, since the paragraph defining violation uses the term "this subdivision," and since that paragraph follows subdivision (5), *ipso facto*, the definition of violation it sets out must only apply to subdivision (5).

The trial court rejected the State's argument, agreeing with Carroll that the definition of violation contained in Section 198.067.3 defines "violation" as that term is used in all of Section 198.067.3, and that under that definition, because Carroll had corrected its deficiencies at the time of reinspection, it was not subject to penalties or fines under Section 198.067.3. The court therefore dismissed the State's claim against Carroll under Section 198.067.3.1.

As noted, the State had also asserted a count against Carroll under Section 198.067.10, in which it alleged that the Class I standard violation had caused serious physical injury to a resident. Section 198.067.10 provides that in such a case, an additional fine shall be levied and this liability "shall be incurred immediately upon citation of the violation and shall not be affected by any subsequent correction of the violation." Although Carroll's motion to dismiss had not separately addressed the alleged violation of Section 198.067.10,

other than to request that no fines be imposed, including those under Section 198.067.10, the trial court also dismissed the State's claims under Section 198.067.10. The State appeals.

## II. STANDARD OF REVIEW

■ When reviewing the trial court's grant of a motion to dismiss, we solely look at the adequacy of the plaintiff's petition and whether it states any ground for relief. *Saidawi v. Giovanni's Little Place, Inc.,* 987 S.W.2d 501 (Mo.App. E.D.1999). We treat all facts pleaded in the petition as true and give the non-moving party the benefit of all reasonable inferences. *Smith v. King City School Dist.,* 990 S.W.2d 643 (Mo.App. W.D.1998). Where the trial court does not state a basis for its dismissal, we presume that dismissal was based on the grounds stated in the motion to dismiss and will affirm if dismissal was appropriate on any ground stated in the motion to dismiss. We will not grant a motion to dismiss on grounds not stated in the motion. *Id.*

## III. LEGAL ANALYSIS

A. *Claims of Violation of Section 198.067.3(1).*

■ As noted above, the State argues that the trial court erred in granting Carroll's motion to dismiss its claim of violation of subsection 198.067.3(1) because, it says, the definition of "violation" the trial court relied on does not apply to that subsection, but only to alleged violations of subsection 198.067.3(5). The State bases this argument primarily on the fact that the paragraph defining the meaning of violation is unnumbered. Therefore, it argues, we cannot determine to what other parts of the statute the definition applies except by looking to its content. The definition says only that it sets out the meaning of violation as used in "this subdivision." Therefore, it must refer to the immediately preceding subdivision, which the State says is subsection 198.067.3(5), and must not set out the meaning of viola-

tion as used in other "subdivisions," such as paragraph 198.067.3(1). Thus, the State argues, even though it would appear that Carroll is not in violation of the statute under the definition of violation set out in the statute, it really is.

We disagree with the State that the definition of "violation" contained in subsection 198.067.3 can be so easily circumvented. First, the portion of Section 198.067.3 defining "violation" is not actually a part of paragraph 198.067.3(5). Rather, as is evident if one refers to the portion of the statute set out above, and as the State necessarily admits, that definition simply follows Section 198.067.3(5). It is unnumbered, and is set out flush to the left of the page.

From this placement, while it is possible that the legislature intended the portion of the statute defining violation to be a second and separate subparagraph of paragraph 198.067.3(5), that appears doubtful, since in such a case its first line would likely be further indented to match the indentation of subsections (1) to (5), as are the first lines of all other new paragraphs set out in this and other Missouri statutes. Since this portion of subsection 198.067.3 is not indented, it seems to be a continuation of the first part of the paragraph numbered 198.067.3, rather than a new paragraph. That is, paragraph 198.067.3 began before subparts 198.067.3(1)-(5) were set out, and simply continued on after setting them out. In effect, subparts .3(1)-(5) are indented in the statute just as a quotation is indented in an opinion or brief, and at the end of this indented portion of the statute, the remainder of subsection 198.067.3 is set out flush to the left of the statute. *See* indented quotation of Section 198.067.3, *supra.*

If the portion of the statute defining violation is not a part of subparagraph 198.067.3(5), then the use of the phrase "as used in this subdivision" in the definition of violation does not require us to limit that definition to subparagraph

198.067.3(5). This does not mean that the use of "this subdivision" is without meaning. Rather, as Carroll points out, where the words in a statute are not defined, and have no commonly established legal meaning, then our Supreme Court has directed us to interpret them according to their plain and ordinary dictionary meaning. *American Healthcare Management, Inc. v. Dir. of Revenue*, 984 S.W.2d 496, 498 (Mo. banc 1999); *Columbia Athletic Club v. Dir. of Revenue*, 961 S.W.2d 806, 809 (Mo. banc 1998). Webster defines subsection and subdivision synonymously. A subsection is "a subdivision or a subordinate division of a section." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2278 (1993). A subdivision is something produced by subdividing. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2274 (1993). Thus, the fact that the legislature chose to use the word subdivision in some parts of the statute, and subsection in other parts, may not indicate that they were intended to have a different meaning, but rather that the legislature simply used these two synonymous words interchangeably. While this may not be a model of draftsmanship, it is consistent with the overall purpose and meaning of the Act, as discussed below.

This reading of the statute also makes common sense for a number of reasons. First, we note that the term violation is used in all five subparts of subsection 198.067.3, and is also used elsewhere in the Act. The only definition of violation contained in any section of the Act is the definition contained in the paragraph of subsection 198.067.3 at issue here. If the State were correct that the definition of violation set out in subsection 198.067.3 applies only to "subdivision" (5) of subsection 198.067.3, then the statute provides no definition of the term violation as used in "subdivisions" (1) to (4) of that subsection. Yet, those subdivisions set out fines for violations of Class I, II and III standards of the Act and for violations of federal standards. This means that the term is simply undefined in those sections.

The State says that this presents no problem, for the definition of violation under those sections is set out in Section 198.085. However, as is evident from a review of Section 198.085,[6] that section simply sets out what constitutes Class I, II and III standards. It says nothing about whether a violation of those standards will be deemed to have occurred immediately upon citation of a deficiency, or only upon reinspection. How, then, is a nursing home, the State, or the public, to know what the term violation means as used in those subsections?

The State seems to suggest that in the absence of a definition, we must hold that a violation occurs as soon as a deficiency is found, and that the State thus has a right to fine a nursing home immediately upon finding a deficiency, except when the deficiency is under subdivision (5) of Section 198.067.3. The State thus asserts in that case, and that case alone, the definition of violation is different, and is as set out in the portion of subsection 198.067.3 which defines violation.

We fail to see why the lack of a definition of violation as used in other subsections must be interpreted to mean that a

---

6. Section 198.085 states:
In establishing standards for the each type of facility, the department shall classify the standards into three categories for each type of licensed facility as follows:
(1) Class I standards are standards the violation of which would present either an imminent danger to the health, safety or welfare of any resident or a substantial probability that death or serious physical harm would result;

(2) Class II standards are standards which have a direct or immediate relationship to the health, safety or welfare of any resident, but which do not create an imminent danger;
(3) Class III standards are standards which have an indirect or a potential impact on the health, safety or welfare of any resident.
Sec. 198.085.

violation occurs immediately upon citation of a deficiency. Nothing in the statute appears to so provide. We also fail to see any rational basis on which the legislature would have defined violation under subdivision 198.067.3(5) to mean a deficiency which is uncorrected upon reinspection, but other violations are defined as occurring immediately upon being cited. As Carroll notes, subdivision 198.067.3(5) sets forth the more serious violations, for it provides for fines for operators who have previously been found to have violated the same standards within the prior 12 or 24 month period. There is no reason such operators should be given more time to correct deficiencies than are those who have not previously been cited for such violations.

Moreover, subsection 198.067.10, discussed *infra*, specifically states that under that section a violation will be deemed to occur immediately without waiting for correction of the deficiency. This caveat would not be necessary if violations always occurred immediately, as the State argues, and its presence shows the legislature knew how to state a violation occurs immediately if it wants to do so.

 In addition, we note that the conclusion that the definition of violation set out in subsection 198.067.3 is intended to apply to all five types of violations set out in that subsection is supported when the Omnibus Nursing Home Act is considered as a whole. All statutes relating to the same subject matter are considered *in pari materia*, and are construed together. *Phillips v. American Motorist Ins. Co.*, 996 S.W.2d 584, 587 (Mo.App. W.D.1999). It is presumed that the legislature intended a logical result and that *in pari materia* statutes be read "consistently and harmoniously." *Id.*

As noted above, Section 198.026 sets out the right of the State to inspect facilities for non-compliance with the Act, and to cite them for deficiencies. As quoted above, it provides that where deficiencies in compliance with Class I standards are found, the inspector will give the operator five days to prepare a plan to address the deficiency, and will accept or reject that plan within five days thereafter. The inspector will then reinspect within 20 days and, *if the deficiency has not been corrected,* will give the operator a notice of noncompliance that informs the operator that the State may seek sanctions and other remedies under Section 198.067.

 In addition, under Section 198.029, if the inspector finds Class I violations and they are not corrected immediately, then the Department may also issue a written notice of noncompliance at the time the noncompliance is found, and may make this fact public and send copies of the notice to various agencies and hospitals. Here, the Department issued such a notice here on September 30, 1997, telling the operator that it must immediately correct the violation and that it must submit an acceptable plan of correction for a Class I violation as required by Section 198.026.2, and that the Department may refer the matter to the circuit court for consideration of a monetary penalty under Section 198.067.

Section 198.029 does not, itself, however, provide for imposition of a monetary penalty for a violation. We thus must refer back to Section 198.026 and 198.067 to determine when and how such penalties may be imposed. And, as discussed above, the definition of "violation" contained in Section 198.067.3 states that a violation means a breach of a standard which remains uncorrected and not in accord with the plan of correction *at the time of reinspection conducted pursuant to subsection 3 of Section 198.026.* It does not say that a violation includes a breach found under Section 198.029, whether or not corrected by the time of reinspection. Indeed, such a provision would be inconsistent with the statutory scheme of providing for monetary penalties for Class I, II and III violations only where the violations continued to exist at the time of reinspection.

Thus, reading all of these sections together, they indicate that if a Class I violation is found and not immediately corrected, the department will issue a notice of noncompliance immediately and provide copies of it to hospitals, social welfare agencies, and so forth. That occurred here. In addition, as occurred here, the operator must comply with Section 198.026.2 by immediately correcting the deficiency and by doing so in accordance with a plan of correction submitted within the time frame set by that section.

In the instant case, at the time of reinspection, the deficiency had been corrected by the time of reinspection, and thus no notice of noncompliance and intent to proceed with sanctions under Section 198.067 was authorized by Section 198.026.3. The Department thus proceeded to seek sanctions under Section 198.067.3 based on the notice of noncompliance sent out under Section 198.029. Yet, as noted above, the definition of violation requires a showing that a breach remains uncorrected at the time of reinspection conducted pursuant to Section 198.026.3. Thus, the preconditions for finding a violation were not satisfied.

The history of the Act also supports our interpretation of it and of the meaning of violation. As initially enacted in 1994, the penalty provisions now contained in Section 198.067.3 were included as a subpart of subsection 2. Thus, what is now Section 198.067.3 was numbered 198.067.2(1), and what is now Section 198.067.3(1)(5) was then Section 198.067.2(1)(a)–(e). Then, as now, the paragraph defining "violation" was set out flush to the left margin following what was then subparts (a) – (e), and, as now, it stated as follows:

> As used in this subdivision the term "violation" shall mean a breach of a specific state or federal standard or statute which remains uncorrected and not in accord with the accepted plan of correction at the time of the reinspection conducted pursuant to subsection 3 of section 198.026 or the regulations established pursuant to Title 42 of the

United States Code. A judgment rendered against the operator of a facility pursuant to this subsection shall bear interest as provided in subsection 1 of section 408.040, RSMo.

Sec. 198.067.2 RSMo 1994 (superceded). This paragraph is identical to the comparable paragraph defining violation under the 1996 revision to the statute.

As earlier discussed, the State's major argument in favor of its interpretation of "violation" is that this definition says it refers to "this subdivision" and that the legislature must have intended to distinguish a subdivision from a subsection, since it uses the word subsection elsewhere in the statute. However, since, as written in 1994, what is now subsection 3 was then subparagraph (1) of subsection 2, the State agrees that as written in 1994, all of subsection 3 would have been considered a "subdivision" as the State says that word is defined – i.e., it is the next level of organization lower than a subsection.

Since, in 1994, what is now subsection 198.067.3(1)-(5) was contained in what the State calls subdivision 198.067.2(1)(a)-(e), the State admits that the definition of "violation" in that version of the statute applied to each subparagraph (a)–(e) of 198.067.2(1). This means that, under the State's own interpretation of the statute, if this action had been brought when the 1994 version of the statute were in effect, then it would be this definition of the term "violation" which would govern this case. And, if that definition were the one to be applied, then the trial court correctly granted Carroll's motion to dismiss as to the alleged violation of Section 198.067.3(1), because under that definition a violation subject to fine does not occur until and unless the State finds that the condition continued to exist upon reinspection, and that did not occur here. By the time of reinspection the problem had been corrected.

However, the State argues, this was all changed by the legislature *sub silencio*

when it revised Section 198.067 in 1996. Since, at that time, it reorganized Section 198.067 and changed 198.067.2(1) into 198.067.3, subparts (a)-(e) of 198.067.2 necessarily became subparts (1)-(5) of 198.067.3. Accordingly, while "subdivision" had previously referred to all five subparts since they were part of subdivision 198.067.2(1), it suddenly referred only to subpart (5), since it follows that subparagraph of what is now 198.067.3, and the word violation in the other subparts of that statute became undefined.

■ We are not persuaded by this argument. We cannot believe that the legislature intended to make such a drastic change in the meaning of violation simply by taking what had been subparagraphs 198.067.2(1)(a)-(e) and renumbering them, without relevant change, as subparagraphs 198.067.3(1)-(5). We do not believe that the legislature could have intended to so greatly change a key provision of the statute in so circuitous a way, leaving the key word "violation" undefined and ambiguous, where it had previously had a well-defined and easily applied meaning. Moreover, if a statute goes through a revision by renumbering or rearranging a section without changing the substance of the statute, the legislature is presumed to have adopted the construction which had already existed. Sutherland Stat Const Sec. 22.27 (5 th ed.1993).

Whether we assume the legislature intended to use the term subdivision synonymously with subsection, since it has no settled meaning, or whether we simply conclude that the legislature accidentally failed to replace the word subdivision with subsection when it renumbered the paragraphs of the statute, the use of that word does not change the otherwise plain meaning of the statute. The definitional paragraph is still flush with the left margin, a placement otherwise indicating it is to modify all the subparts of subsection .3 of 198.067, and it makes sense that it would do so, since only in this way would the key term violation be defined as used in all of the penalty provisions of the statute, rather than just in one of the five penalty provisions at issue. This interpretation of the statute also appears to effectuate the intent of the legislature, always the primary rule of statutory construction.

For all of these reasons, we conclude that the trial court did not err in concluding that the definition of violation contained in the statute applied to the violations alleged against Carroll under Section 198.067.3(1), and that because the deficiencies were corrected by the time of reinspection, the trial court did not err in dismissing the State's claim under section 198.067.3(1).

*B. Claims of Violation of Section 198.067.10.*

■ In addition to its claim that Carroll violated Section 198.067.3(1), the State also brought a claim against Carroll for violation of Section 198.067.10. That subsection states:

In addition to the civil penalties specified in subdivision (1) of subsection 3 of this section, any facility which is cited with a violation of a class I standard pursuant to subsection 1 of section 198.085, when such violation results in serious physical injury or abuse of a sexual nature pursuant to subdivision (1) of section 198.006, to any resident of that facility shall be liable to the state for a civil penalty of one hundred dollars multiplied by the number of beds licensed to the facility, up to a maximum of ten thousand dollars pursuant to subsections 1 and 2 of this section. *The liability of the facility for civil penalties under this section shall be incurred immediately upon the citation of the violation and shall not be affected by any subsequent correction of the violation.* For the purposes of this section, "serious physical injury" means physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impair-

ment of the function of any part of the body.

Sec. 198.067.10 (emphasis added).

The State argues that it was error to grant Carroll's motion to dismiss the State's claim that Carroll violated this provision, for the motion to dismiss did not request dismissal of this count or separately address why this count did not state a claim, and a motion to dismiss can be granted only on grounds stated in the motion. *Hellmann v. Walsh*, 965 S.W.2d 198, 200 (Mo.App. E.D.1998); *Property Exchange & Sales v. King*, 822 S.W.2d 572, 573 (Mo.App. E.D.1992).

We concur. While Carroll says that it did inferentially refer to the allegations under subsection 10 because it complained of the entire fine imposed, on these facts we do not find this to be sufficient to have alerted the State that Carroll was requesting dismissal of the subsection 10 allegations also. Moreover, the issues raised under subsection 10 are different from those addressed in the preceding section, and none of them were addressed in substance by any of the parties. More specifically, Section 198.067.10 states that "the liability of the facility for civil penalties under this section shall be incurred immediately upon the citation of the violation and shall not be affected by any subsequent correction of the violation." In other words, subsection 10 does just what subsection 3 did not do – it gives the State authority to impose a penalty at the time the citation is made, and does not require the State to wait to see whether the problem is corrected at reinspection before imposing a penalty.

Here, the State alleges that a patient at the facility had tuberculosis, yet was left in the general population, subjecting the other residents to danger and causing serious physical injury to the patient with tuberculosis. While we do not know whether the State will be able to prove these claims, if true, they would entitle it to relief under Section 198.067.10. Therefore, it was error to grant Carroll's motion to dismiss the State's claim alleging a violation of Section 198.067.10.

For all of these reasons, the judgment of the trial court dismissing Count I alleging violation of Section 198.067.3(1) is affirmed, and the judgment of the trial court dismissing Count II alleging violation of Section 198.067.10 is reversed and remanded for further proceedings not inconsistent with this opinion.

Senior Judge FOREST W. HANNA and Presiding Judge HAROLD L. LOWENSTEIN, concur.